IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **JAMES CHRISTOPHER BENVIE**, | ) | No. CR 19-1715 RB |
| | ) | |
| Defendant. | ) | |

## <u>UNITED STATES' RESPONSE TO DEFENDANT'S OBJECTIONS TO PSR</u>

Defendant James Christopher Benvie was convicted of two counts of impersonating a federal officer, a violation of 18 U.S.C. § 912, at the conclusion of his trial which began March 2, 2020.   The defendant's conduct justifies two enhancements under the United States Sentencing Guidelines as identified in the Presentence Report (PSR).

### I.    Background

The jury convicted the defendant of falsely impersonating a United States Border Patrol Agent on two occasions on April 15, 2019, and April 17, 2019, in violation of 18 U.S.C. § 912. On each of these dates, the defendant video-taped himself stating "Border Patrol" to groups of aliens illegally present in the United States.    Following these false claims, the defendant detained the aliens and gave them commands about what they should do and asked them questions regarding their nationality.

### II.    Argument

#### a.    The 6-level enhancement pursuant to USSG § 2J1.4(b)(1) is proper.

The enhancement is justified and supported by the evidence, including relevant conduct. "If the impersonation was committed for the purpose of conducting an unlawful arrest, detention,

or search, increase by 6 levels."    USSG § 2J1.4(b)(1).    In *United States v. Tholl*, 895 F.2d 1178

(7th Cir. 1990), the Court discussed the difference between physical restraint as it pertains to

USSG § 3A1.3 (as defined by USSG § 1B1.1) and USSG § 2J1.4(b)(1).    The Seventh Circuit

stated

> When the guidelines are viewed in their totality, it becomes clear that the
> "physical restraint" enhancement contained in section 3A1.3 had a very obvious
> purpose:    the drafters of the guidelines intended that any offender who physically
> restrains his victim should receive a two-level offense increase over offenders
> who commit the same offense but do not restrain their victims. . . .    When this
> underlying policy is understood and considered in light of the specific offense
> characteristic of Impersonation as worded in section 2J1.4(b)(1), it becomes clear
> that the customary two-level "physical restraint" enhancement was not taken into
> account in this section.

*Tholl*, 895 F.2d at 1185.

> Furthermore the "failure to include a specifically defined term within the specific
> offense characteristic of Impersonation in section 2J1.4, while listing it in other
> specific offense characteristics, suggests that the omission was intentional.
> Morever, while the specific offense characteristic for Impersonation does list
> "arrest," that term is not the functional equivalent of the sort of "physical
> restraint" as defined in section 1B1.1, Application Note 1(i) (defining "[p]hysical
> restraint" as "the forcible restraint of the victim such as being tied, bound, or
> locked up").

*Id.*    Ultimately, the Court agreed that "an arrest, as that term is used in section 2J1.4(b)(1), does

not necessarily entail the sort of forcible physical restraint contemplated by section 1B1.1,

Application Note 1(i).    *Id.*    The Court in *Arcoren v. United States*, 929 F.2d 1235, 1247-48 (8th

Cir. 1991) reached the same conclusion in its discussion of another guideline provision.    The

Court noted that "[a]s in *Tholl*, 'physically restrained' is not a specific offense characteristic of

Criminal Sexual Abuse in section 2A3.1(b)."    *Id.* at 1248.

The United States adopts the rationale and facts in support of the enhancement as set

forth in the PSR (Doc. 56) and the PSR addendum (Doc. 59).    Furthermore, the United States

asserts that the enhancement is supported by additional facts.   The defendant admitted at trial that it was his intent to get the aliens to sit down and not move.   Tr. at 30.[1]   While the defendant claimed not to carry firearms, he admitted that others in his group carried them.   Tr. at 33.   He himself also wore clothing displaying a badge during his first couple of weeks in the field.   Tr. at 33-34.

Consistent with the video from April 15, 2019, introduced at trial as Government Exhibit 1, the defendant admitted that he uttered the words "Border Patrol" and that he asked the aliens what they were doing.   Tr. at 44, 46.   During that encounter, the defendant detained the aliens for approximately five minutes before he turned them over to a Border Patrol agent.   Tr. at 46-47.   In the interim, there was no Border Patrol agent near him that he could see, and the defendant he spent his time interrogating aliens in the group he had stopped.   Tr. at 48-49.   The defendant also admitted, as reflected in the video of the event, that Border Patrol had not been called yet because he was still trying to get some information from the aliens.   Tr. at 50.   He essentially conceded that his questioning of the aliens were more important than turning them over to Border Patrol.   Tr. at 51.   The actions by the defendant on April 15, 2019, alone substantiate the enhancement.

The defendant's actions on April 17, 2019, further support the enhancement for detaining aliens while impersonating a Border Patrol agent.   On that date, he began by telling a small group of aliens to "Stop" and also tried to get them to sit down.   Tr. at 55-56.   When asked whether he and other United Constitutional Patriots (UCP) were stopping and detaining immigrants, the defendant responded, "We asked them to stop and we asked them to sit down."

---

[1] "Tr." refers to the trial transcript from Tuesday, March 3, 2020.

Tr. at 61.   *See also*, Government Trial Exhibit 8 (8:56-8:58). Trial Exhibit 8 also established that the defendant, and eventually an armed UCP member, detained the group for a little more than two-and-a-half minutes before a Border Patrol vehicle arrived.

The defendant's relevant conduct further establishes that the detention enhancement is warranted.   *See* USSG § 1B1.3.   When questioned about other videos the defendant posted online as part of his activities at the border, he acknowledged that he had posted one video titled "Hunting Illegals" on March 7, 2019.   Tr. at 62.   He further admitted that about fifteen days prior to his arrival at the border he "might have said the United Constitutional Patriots captured 3,000 people."   *Id.*   On a live-stream video on March 8, 2019, the defendant captioned that encounter with the title "We Just Captured Two Unaccompanied Minors at the U.S./Mexico Border."   *Id.* at 65.   The defendant agreed that the video showed three other UCP members wearing camouflage and carrying assault rifles emerge from the brush and detain two juvenile immigrants.   *Id.* at 65-67.

The defendant admitted that on March 15, 2019, he was part of another live-stream video which he captioned, "Detained Four Brazilians Illegally Crossing the U.S./Mexico Border."   *Id.* at 67.   This video showed the apprehension and detention of four immigrants that crossed near Brickland Road, which is near the Monument 1 area.   *Id.* 67-68.

The defendant further acknowledged that about a week later he made a live-stream video which was captioned, "Caught a Group of 13 Brazilians with Kids Sneaking Across the U.S./Mexico Border."   *Id.* at 68.   This video showed a group of UCP members apprehending a group of immigrants entering the United States near Brickland Road.   *Id.*   Two of the UCP

4

members yelled at the aliens in Spanish to stop and sit down.   *Id.*   Members of the UCP were

wearing masks, camouflage uniforms, bulletproof vests, and carrying assault rifles.   *Id.* at 68-69.

Similar activity took place the following day on March 24, 2019.   Members of the UCP

stopped two additional immigrants on Brickland Road.   *Id.* at 69.   The defendant and others

again told the immigrants to stop and sit down.   *Id.*   The same happened on April 1 and April 5.

*Id.* at 70-74.   The April 5th incident involved the defendant stopping a woman in the desert up

on a hill.   The defendant admitted that he "may have" told another UCP member to keep the

woman they detained there and not let her move.   *Id.* at 73.   The video shows that the defendant

went so far as to instruct his fellow UCP member to tell the woman in Spanish that she would be

separated from the other immigrants with whom she traveled if she failed to give up the others.

*Id.* at 73-74.   The defendant encountered another alien in the same area and eventually walked

both aliens down the hill to turn them over to Border Patrol agents.   *Id.* at 76-77.   The

defendant turned the aliens over to the agents approximately twenty minutes after the

apprehension.   *Id.* at 77-78.

On April 16, 2019, the defendant and his group ordered a large group of aliens to sit

down.   He admitting to saying on that occasion that, "There's no Border Patrol here.   This is us,

this is our group."   *Id.* at 78-79.   On April 19, 2019, the defendant stated on a video that the

situation at the border was similar to that of a hurricane.   *Id.* at 79.   He also claimed that,

"Sometimes you have to do things you wouldn't normally do, and some of those things are

illegal."   *Id.*

The enhancement applies based not only on the underlying conduct from Counts 1 and 2 of the indictment as noted above, but on the defendant's relevant conduct because relevant conduct includes:

> (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

USSG § 1B1.3(a)(1)(A), (B).   Relevant conduct also includes "(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions."   USSG § 1B1.3(a)(3).

The commentary to the guidelines notes that

> The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability.   Under subsections (a)(1) and (a)(2), the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator.

USSG § 1B1.3, comment. (n.1).   Furthermore,, "A "jointly undertaken criminal activity" is a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy."   USSG § 1B1.3, comment. (n.2).

Clearly, the defendant's conduct described above qualifies for the enhancement because the defendant, at a minimum, committed acts warranting the enhancement or "aided, abetted, counseled, commanded, induced, procured, or willfully caused" such acts to happen.   USSG §

6

1B1.3(a)(1)(A).   In addition, it was reasonably foreseeable that others in the group would detain immigrants in furtherance of the jointly undertaken activity.   *See* USSG § 1B1.3(a)(1)(B).

### b.   The 2-level enhancement pursuant to USSG § 3C1.1 is proper.

The United States adopts the rationale and facts in support of the enhancement as set forth in the PSR (Doc. 56) and the PSR addendum (Doc. 59).   "If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels."   USSG § 3C1.1. Committing perjury is an example of conduct that qualifies for the enhancement.   USSG § 3C1.1, comment. (n.4).

"To impose an enhancement for perjury, the sentencing court must identify 'the perjurious statement . . . at least in substance,' and '[o]nce the perjurious statement is identified, . . . findings that such testimony was false, material, and given with intent to commit perjury' can be 'fairly conclusory.'"   *United States v. Paup*, 933 F.3d 1226, 1235 (10th Cir. 2019) (quoting *United States v. Massey*, 48 F.3d 1560, 1573-74 (10th Cir. 1995)).   "The elements of perjury are that a witness: (1) when testifying under oath, gives false testimony; (2) concerning a material matter; (3) with willful intent to provide false testimony, rather than as a result of confusion, mistake, or fault memory."   *Massey*, 48 F.3d at 1573.   The sentencing court "'must review the evidence and make independent findings necessary to establish [the elements of perjury].'" *United States v. Mounkes*, 204 F.3d 1024, 1029 (10th Cir. 2000) (quoting *United States v. Dunnigan*, 507 U.S. 87, 95 (1993)).   The court "need not recite the perjured testimony

7

verbatim" and may generally identify the testimony at issue so that when the appellate court reviews the transcript it can review the *Dunnigan* findings regarding the perjury elements without having to speculate on what the court might have believed was the perjurious testimony. *Mounkes*, 204 F.3d at 1029.

There are a number of places the Court can turn to when finding the defendant perjured himself with his trial testimony.

- The defendant stated, "I'm not a Border Patrol Agent.   I never portrayed myself as a Border Patrol agent."   Tr. at 38.

- The defendant stated, "And so bottom line is I was acting as a civilian Border Patrol. And I don't—there's no law against that.   We have a right, when they declare a national emergency."   Tr. at 39.

- The defendant said, "They would stop if they knew the word and they thought that I could either get them to Border Patrol or I was associated with Border Patrol.   And the fact is I was associated with Border Patrol."   Tr. at 58.

- When asked whether he was given authority by the Border Patrol to detain people, the defendant responded, "We were given the authority to ask them to stop and sit down, yes, we were."   Tr. at 59.

- When asked whether he had any evidence that the Border Patrol asked his group to patrol the border on Border Patrol's behalf, the defendant said, "Well, I think it's pretty obvious" and "I think the evidence is right in front of you," meaning that the Border Patrol did authorize that activity.   Tr. at 64-65.

- The defendant admitted that in one of his videos he had said, "Sometimes you have to do

things you wouldn't normally do, and some of those things are illegal."   Tr. at 79.

- When asked whether Border Patrol as an agency gave him the authority to detain anyone, the defendant implied that he had authority "to have them stop and sit down."   Tr. at 93. And when asked whether he had a document from the Border Patrol asking him to do anything, he admitted that he did not "personally."   He went on to state, "They were there before I got there, but I can tell you this:   That trailer that was asked to be removed by the railroad was put there for the specific purpose of aiding Border Patrol, with the permission of the City of Sunland Park and the Border Patrol.   Had there been no permission, that trailer wouldn't have been there."   Tr. at 94.

The elements of False Personation of an Officer or Employee of the United States are as follows:   first: the defendant falsely assumed or pretended to be an officer or employee acting under the authority of the United States; second: the defendant knew that such assumption or pretension was false; and third: the defendant committed any act within the assumed role. Doc. 47 at 13.   The statements above (as well as other testimony at trial) leave little doubt that the defendant testified under oath and gave false testimony concerning a material matter with the intent to provide false testimony and that his testimony was not the result of confusion, mistake, or faulty memory.   *See Massey*, 48 F.3d at 1573; USSG § 3C1.1.

Statements calling for the enhancement are those where the defendant denied that he was acting as a Border Patrol agent when it is abundantly clear that he was.   For example, the defendant stated under oath that, "I'm not a Border Patrol Agent.   I never portrayed myself as a Border Patrol agent."   Tr. at 38.   Government Exhibits 1 and 8 alone belie that claim.   The defendant claimed to be Border Patrol in each of those videos and uttered commands to and asked

questions of immigrants in the same manner a Border Patrol agent would.   The defendant acted like a Border Patrol agent then claimed at trial that he did not.   This was a material misstatement because the jury would have acquitted him if they believed him on this point since the government was required to prove that the defendant falsely assumed or pretended to be an officer or employee acting under the authority of the United States.

Furthermore, the defendant's trial testimony was material because the jury could have acquitted him if they believed his story.   His statements under oath, if believed, could have established that the defendant assumed or pretended to be a Border Patrol agent and that he was, in fact, acting under authority given to him by the Border Patrol, when in reality he was not. The defendant falsely claimed to have authority to act as a Border Patrol agent when he claimed he was "civilian Border Patrol," Tr. at 39, when he was not.   The same applies to the defendant's statement that he "was associated with Border Patrol."   Tr. at 58.   When asked whether he was given authority by the Border Patrol to detain people, the defendant responded, "We were given the authority to ask them to stop and sit down, yes, we were."   Tr. at 59. These are just a few examples of the materially false statements the defendant made that warrant an obstruction enhancement.   He claimed at trial that he was acting under authority of the United States when he had no such authority.   The obstruction enhancement applies.

## III.    Conclusion

The enhancements for detaining people in an assumed role as a Border Patrol agent and for obstructing justice by committing perjury are warranted based on the defendant's conduct and testimony in this case.   Consequently, his total offense level is 16, and his criminal history category is I.   His advisory guideline range is 21-27 months.   The United States respectfully

requests this Court to impose a sentence within this range.

Respectfully submitted,

JOHN C. ANDERSON
United States Attorney

***Filed electronically on 8/12/2020 by***
RANDY M. CASTELLANO
RENEE L. CAMACHO
Assistant United States Attorneys
200 N. Church Street
Las Cruces, New Mexico 88001
(575) 522-2304 – Tel.
(575) 522-2391 – Fax

I hereby certify that I electronically filed
the foregoing with the Clerk of the Court
using the CM/ECF system which will send
notification to all counsel of record.

_____/s/_____
RANDY M. CASTELLANO
Assistant U.S. Attorney

11