```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW MEXICO
 2
      UNITED STATES OF AMERICA,      )
 3                                   )
                    Plaintiff,       )
 4                                   )
                    vs.              )  NO: 19-CR-1715 RB
 5                                   )
      JAMES CHRISTOPHER BENVIE,      )
 6                                   )
                    Defendant.       )
 7
           TRANSCRIPT OF ZOOM VIDEO CONFERENCE PROCEEDINGS
 8                    SENTENCING HEARING
              BEFORE THE HONORABLE ROBERT C. BRACK
 9                UNITED STATES DISTRICT JUDGE
              THURSDAY, OCTOBER 15, 2020, 1:29 P.M.
10           LAS CRUCES, DOÑA ANA COUNTY, NEW MEXICO

11    Video Appearances of Counsel:

12        FOR THE UNITED STATES:

13                  UNITED STATES ATTORNEY'S OFFICE
                    District of New Mexico
14                  200 N. Church St.
                    Las Cruces, NM  88001
15                  BY:  RANDY CASTELLANO, ESQ.

16        FOR THE DEFENDANT:

17                  LAW OFFICE OF ORLANDO MONDRAGON
                    1028 Rio Grande Ave.
18                  El Paso, TX 79902
                    BY:  ORLANDO MONDRAGON, ESQ.
19
      Also Present:  Sabrina Nagel and Nick Nevares, Probation
20                  Officers
                    Parker Olding, Case Agent
21                  Eric Cremeens

22        (Proceedings reported by machine shorthand and
      transcript produced by Computer-Aided Transcription.)
23    REPORTED BY:    VANESSA I. ALYCE, CRR, RPR, NM CCR, FOCR
                    100 North Church Street
24                  Las Cruces, NM  88001
                    Phone:  (575) 528-1430
25                  Email:  Vanessa_Alyce@nmd.uscourts.gov
```

1                    (On the record at 1:29 P.M.)

2              THE COURT:  Good afternoon, everyone.  This is

3    Judge Brack.

4              This is *United States of America versus James*

5    *Christopher Benvie.*  Mr. Benvie appears this afternoon by a

6    remote video link from the Cibola County Detention Center.

7    His counsel, Mr. Mondragon, also appears by a remote video

8    link, as does Mr. Castellano on behalf of the Government.

9    Ms. Nagel is here from the Probation Office, as well; here

10   also by video.

11             I have a waiver form that was filed just

12   yesterday, October 14th.  It bears the signature of

13   Mr. Benvie and Mr. Mondragon and it waives Mr. Benvie's

14   personal appearance at the hearing this afternoon.  And

15   given the pandemic, I'll find that it is in Mr. Benvie's

16   interest, as well as that of justice, generally, that he be

17   allowed to proceed in this fashion.

18             We're here for sentencing this afternoon.

19             Mr. Benvie, are you able to hear me okay?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  All right.  Mr. Mondragon, I have

22   reviewed the PSR.  Have you reviewed the Presentence

23   Investigative Report with Mr. Benvie?

24             MR. MONDRAGON:  We have, Your Honor.  And we've

25   reviewed both of them.

1          THE COURT:  All right.  Are there any additions,

2  corrections, or objections other than those noted in your

3  pleadings?

4          MR. MONDRAGON:  No, Your Honor.  Just the

5  objections I filed.

6          THE COURT:  All right.  So I've reviewed the PSR;

7  your objections to the PSR that were filed May 20th; the

8  Government's response thereto, filed August the 12th; an

9  addendum to the Presentence Report that was filed on

10  July 7th relating to objections; and a revised PSR.  I've

11  reviewed both the original and the revision that was filed

12  September the 9th, minutes from the August 18th

13  detention hearing, and an order relating to that detention

14  hearing.

15          Mr. Mondragon, is there anything -- well, I was

16  handed, just a few moments before I came in, an exhibit list

17  from you that transmits an -- you call it an "affidavit" of

18  Antonio Herrera, in fact, it's a letter addressed to me from

19  Mr. Herrera, and then some -- a letter to the FBI director

20  by members of Congress, media excerpts regarding the ACLU

21  and the militia.  I have not had a chance to review all of

22  those things.  It was just handed to me.  I guess it was

23  filed late last night and I've just now seen it.  So if you

24  want to point to particular matter contained in your

25  exhibits, I'll be glad to zero in on those.  And I think one

4

1    of the case agents, Parker Olding, appears this afternoon by

2    phone -- I guess, Jess?  Or on Zoom.  And Mr. Cremeens, the

3    father to the victim of one of Mr. Benvie's earlier -- well,

4    there was a matter relating to collecting funds on behalf of

5    Mr. Cremeens' son.

6                So Mr. Mondragon, having said that, is there

7    anything else I should have considered by way of preparing

8    for the hearing this afternoon?

9                MR. MONDRAGON:  No, Your Honor.

10               THE COURT:  All right.  Let me hear you on your

11   objections.  I've read the materials, as I've said.  If you

12   have anything else you'd like to say relating to them, I'm

13   glad to hear you.

14               MR. MONDRAGON:  Let's see, Your Honor, I guess

15   the Court remembers the trial.  It was a two-day trial.  And

16   I guess they have two videos that, even though there's other

17   testimony about the group that my client was involved with,

18   the Patriots, that they're detaining people, but the videos,

19   themselves, the videos that we had as evidence showed my

20   client stopping them, but to say that it rose to the level

21   of an arrest, a detention, a search -- I think the Guideline

22   reads that "with intent to conduct an unlawful arrest,

23   detention or search."  And my client's, I guess, intent was

24   to stop them.  It was never to hold them against their will

25   or detain them.  He was to stop them from coming in

1    illegally.  So I don't know if it rises to the level where

2    you can give him a six-level increase because, based on the

3    facts, we don't think it rises to the level of an arrest,

4    unlawful detention or a search.

5            The individuals were not handcuffed.  They

6    were -- I mean, they were pretty much free to leave.  They

7    were not restrained.  And the individuals, at least on the

8    videos, that did have weapons was [sic] not my client, Your

9    Honor, it was the other Patriots that were there.  And

10   they're the ones that had weapons.  And I guess, if I was

11   one of the aliens, I would consider them more of detaining

12   me than Mr. Benvie, because they're the ones with the

13   weapons; they were an authority and they could cause harm to

14   them.

15           So that's one of the reasons for the objections,

16   Your Honor, because we don't believe that it resulted in an

17   unlawful detention, arrest, or search of those individuals.

18   And I think the Guideline's more, Your Honor, for something

19   else besides just stopping them.  Usually, when you have an

20   unlawful arrest, there's something else behind it.  Are they

21   going to rob them?  Are they going to kidnap them?  We

22   didn't have none of that here, so I don't think the

23   Guidelines should -- that enhancement should apply, Your

24   Honor.

25           Regarding the perjury charge, Your Honor, the

1    two-level enhancement --

2                THE COURT:  Mr. Mondragon, let me interrupt you.

3    Let me allow Mr. Castellano --

4                MR. MONDRAGON:  Okay.

5                THE COURT:  -- to respond, and Ms. Nagel to

6    respond, if she'd like --

7                MR. MONDRAGON:  Understood, Your Honor.

8                THE COURT:  -- relating to the first objection

9    before we move to the second.  And when it's your turn to

10   speak again, Mr. Mondragon, if there's anything you can do

11   to increase the volume, that would help me.  I'm having a

12   little difficulty hearing you.  And I'm sure that has to do

13   with the -- as much to do with my hearing problem, my

14   hearing loss, as it does the technology, but anything you

15   can do to help me would be appreciated.

16               Mr. Castellano, respond to the first objection,

17   please.

18               MR. CASTELLANO:  Yes, Your Honor.  As indicated

19   in my response, there is a difference between 2J1.4(b)(1),

20   which is the provision we're talking about now -- and the

21   Courts have noted that the failure to include a specifically

22   defined term within the offense characteristic of

23   impersonation seems to suggest that it was intentional and

24   that an arrest, as that term is used in this section, does

25   not necessarily entail the sort of forceable physical

1   restraint contemplated by other provisions of the

2   Guidelines.

3           So I think, looking at the two dates of -- in

4   which we have convictions, there is sufficient evidence on

5   those dates, alone, where the defendant stopped people,

6   questioned them for some period of time, and held them, even

7   if it was for a mere period of minutes until Border Patrol

8   got there, that they certainly were restrained or stopped,

9   as contemplated by this particular Guideline.

10          I've also noted for the Court some of the other

11   conduct, the relevant conduct in this case in which

12   Mr. Benvie admitted under cross-examination that, on many

13   other occasions, he had, even in his videos, noted that they

14   had captured or detained or used other similar words when

15   encountering the migrants in this case.  And so I think the

16   two instances where he was convicted are sufficient to

17   support this enhancement.  I also believe the relevant

18   conduct also is sufficient to establish that the enhancement

19   applies in this case.

20          And so, since the Court has read my response, I'm

21   not sure I'll need to add much more unless the Court has

22   questions, but I think it's pretty clear that for purposes

23   of that Guideline provision that these individuals were

24   detained.

25          THE COURT:  Ms. Nagel, is there anything you'd

1    like to add to the addendum?

2              PROBATION OFFICER:  I don't, Your Honor.  Unless

3    you have specific questions.

4              THE COURT:  No, ma'am, I don't think so.

5              The proposed enhancement relates to if the

6    impersonation was committed for the purpose of conducting an

7    unlawful arrest.  And as I recall the testimony and the

8    videos, I think that you've got a bunch of people out there

9    who were, several of them, dressed in camouflage, some of

10   them carrying weapons.  The clothing that they were wearing

11   confused even Border Patrol agents, I'm told, and not only

12   that, the -- Mr. Benvie, when encountering one of the

13   groups, told them to stop, he asked them what they were

14   doing and then began to question them and at one point told

15   them to sit down for that questioning.

16             For the purposes of the six-level increase, I

17   believe that the impersonation was committed for the purpose

18   of conducting an unlawful arrest and I will deny the defense

19   objection relating to that six-level increase for the

20   reasons stated and the reasons contained in the Government's

21   response and the addendum.

22             Mr. Mondragon, I'll hear you on your second

23   objection.

24             MR. MONDRAGON:  Your Honor -- sorry.  Sorry, Your

25   Honor.

1          THE COURT:  Go ahead.

2          MR. MONDRAGON:  Your Honor, I guess, on that one,

3   I'll just stand by my written objection, basically that the

4   fact that the jury found him guilty doesn't -- not

5   necessarily make -- sustain that he committed perjury, Your

6   Honor.  He might have testified differently and -- but a

7   difference of -- in testimony does not make perjury.  Your

8   Honor would have to find that he, I guess, intentionally and

9   knowingly lied under oath.  I believe in -- subjectively, my

10   client, what he testified to is what he believed happened.

11   And the fact that the agents or the Border Patrol believed

12   differently, I don't think it rises to perjury, Your Honor.

13   That's what I have on that.

14          THE COURT:  Thank you.

15          Mr. Castellano, do I need to make a specific

16   finding that there was perjury in order for this enhancement

17   to apply?

18          MR. CASTELLANO:  Let me check, Your Honor.  I

19   think the short answer is probably yes.  And that's why I

20   have done my best to outline the specific statements in this

21   case, which -- which would support that enhancement.

22          So the requirement is, yes, if -- a perjurious

23   statement needs to be identified, finding that such

24   testimony was false, material, and given within with the

25   intent to commit perjury.  The case law says it can be

1    fairly conclusory, once the Court generally identifies the

2    nature of the statements that were provided.  It doesn't

3    have to be specific, but I have given the Court specific

4    statements in this case which I think support the perjury

5    enhancement in this case or the obstruction enhancement.

6    (Reading) "The Court need not recite the perjured testimony

7    verbatim, but may generally identify the testimony at issue,

8    so that when the appellate Court reviews the transcript, it

9    can review the *Dunnigan* findings regarding the perjury

10   elements without having to speculate on what the Court might

11   believe was the perjurious testimony."

12            So I think the Court, in a sense, does need to

13   find that the statement or statements were perjurious in

14   nature.  And those statements, I would say, generally, are

15   those in which the defendant claimed not to be acting as a

16   Border Patrol agent, when it is abundantly clear that he

17   was.  I think the other statements would be those where he

18   claimed to have been acting with authority given by the

19   Border Patrol.  And he did state -- when asked whether he

20   was given authority by the Border Patrol to detain people,

21   defendant responded (reading), "We were given the authority

22   to ask them to stop and sit down, yes, we were."  And that's

23   from his testimony on pages 58 and 59 of the transcript.

24   And of course, the other statements would be where he said

25   he wasn't acting as a Border Patrol agent.  And those

1  statements are material because, had the jury believed those

2  statements, they would have had to acquit him.  And so they

3  were certainly material in nature because they went to the

4  elements of the offense.

5        I was reviewing -- and related to his testimony

6  and some of the things he said, I reviewed Agent Slosar's

7  testimony last night.  He was the patrol agent in charge

8  from the Santa Teresa station.  He said that, in that fiscal

9  year, they apprehended approximately 24,000 people in the

10 fiscal year in which Mr. Benvie was arrested out there.

11 Mr. Benvie testified that, quote -- when he was asked

12 (reading), "So you said you were associated with Border

13 Patrol, in your mind, because you had spoken to Border

14 Patrol agents?"  That's on page 58 of his testimony.

15       His response was, "Since I was there for

16 five months and I turned over 12,970 people, that's a little

17 bit more than association."

18       And so clearly, he claimed to have been

19 associated with them.  He made a fairly outlandish claim

20 that he was responsible for more than half of the Border

21 Patrol apprehensions in the territory in that fiscal year,

22 and because he believed that was true, or at least he told

23 the jury that was true, he felt he was associated enough

24 that he had authority to do these things when, in fact, he

25 did not have authority to do them.

1          So as I said earlier in the response, I
2     identified a number of statements that I think qualify.  And
3     the Court could rely on those for purposes of finding the
4     enhancement applies.
5          THE COURT:  Thank you.
6          And Ms. Nagel?
7          THE DEFENDANT:  Can I interject something here,
8     since he's referring to my statements?
9          THE COURT:  No, sir.  I'm going to certainly give
10    you an opportunity to speak, Mr. Benvie, in turn, but this
11    wouldn't be the time.
12          Ms. Nagel, did you have anything you wanted to
13    add to your addendum?
14          PROBATION OFFICER:  I don't, Your Honor.
15          THE COURT:  All right.
16          I will find that Mr. Benvie perjured himself at
17    the trial.  I think it's in -- there are several instances
18    of perjury.  And one of them was he said, "In fact, I was
19    associated with Border Patrol."  And asked whether he was
20    given authority by Border Patrol to detain people, he
21    responded, "We were given that authority to ask them to stop
22    and sit down, yes, we were."  And in the video, he referred
23    to himself as "Border Patrol."  And then, at trial, he said
24    "I'm not a Border Patrol agent and I never portrayed myself
25    as one."

 1          And in one of the videos, Mr. Benvie went so far

 2   as to say, "Sometimes you have to do things you wouldn't

 3   normally do and some of those things are illegal."  He never

 4   admitted to any such conduct in front of the jury, but

 5   rather denied that conduct.  When questioned about who gave

 6   him that particular authority, he indicated that several

 7   agents had, but he declined to identify them.

 8          And in those -- these statements that I've

 9   referenced were material, given that, if the jury had

10   believed any of them, that he was actually deputized or

11   authorized by Border Patrol to encounter these people, stop

12   them, make them sit down, ask them questions, then it's a

13   whole 'nother issue.  But in fact, I don't believe he had

14   that authority.  I think he misrepresented that authority.

15   And on that basis, I will deny the objection relating to the

16   perjury enhancement.

17          Mr. Mondragon, are there any -- any other

18   objections that we need to deal with?

19          MR. MONDRAGON:  No, Your Honor, those were my

20   only two.

21          THE COURT:  Mr. Castellano, anything else on the

22   objections?

23          MR. CASTELLANO:  No, Your Honor.

24          THE COURT:  All right.  Then, Mr. Mondragon, I'll

25   hear you on Mr. Benvie's behalf, generally.

1        MR. MONDRAGON:  Your Honor, I guess the reason I

2   provided the exhibits regarding the -- I guess, the media

3   excerpts and the letters from the Congress to the FBI is, I

4   guess, to show the climate at that time.  And still my

5   client, to this day, believes that basically it's a

6   political prosecution, even though the jury found otherwise,

7   Your Honor.  But this is just to shed light on the climate

8   at that time.

9        The other affidavit or letter, Your Honor, is

10   from when he was out on bond.  That was his actual

11   immediate -- I guess, his -- his boss.  The owner of the

12   restaurant where he worked.  And I know that he -- my client

13   was revoked on the conditions of release because he was not

14   where he was supposed to be, but according to Mr. Herrera's

15   letter, Your Honor, he was a good employee, never touched

16   alcohol.  He kept his business above water.  So he was very

17   productive while he was out on bond.  And he was there for

18   about a year, Your Honor, without any violations until the

19   violation that got him detained.

20        And Your Honor, in talking to my client, and I

21   think the Court's aware from when we had the trial, he's

22   very adamant.  He still thinks that he had a right to be out

23   there.  I would just ask the Court to look at the -- his

24   main purpose to be out there, Your Honor, wasn't really to

25   harm these individuals.  In talking to him, Your Honor, a

1    lot of the times, the individuals, they -- I guess they

2    stopped.  Some were needing help.  They gave them help.

3    They had worse offenses other than illegal reentry.  There

4    were convicted felons out there.  So to him, he was doing --

5    he was serving a purpose, Your Honor.

6           We don't have anything else besides

7    impersonation, Your Honor.  You don't have -- typically, on

8    this type of offense, you have them where they do something

9    else besides -- they use impersonation to do something else,

10   to take money, to physically assault them.  We didn't have

11   that here, Your Honor.  My client honestly believed he was

12   out there doing a job, trying to keep dangerous people out,

13   Your Honor.  And like I said, he would track down Border

14   Patrol and they would go to Border Patrol, but there was

15   nothing else to it.  He didn't harm them in any way.  These

16   individuals, if my client wasn't there, they would have made

17   it probably illegally into the U.S., and some of them

18   probably have offenses.

19           If you look at his history, Your Honor, he does

20   have some issues, Your Honor, but my client's been mostly

21   productive.  He's had a working history.  I didn't file a

22   variance motion, Your Honor, but I think, the one year that

23   he was out on conditions of release, he complied with

24   everything.  So I would think he would be a good probation

25   candidate.  And if not, Your Honor, we would ask for the

1   bottom end of the Guidelines.  But that's all we have, Your

2   Honor.

3           THE COURT:  Thank you.

4           Mr. Castellano?

5           MR. CASTELLANO:  Your Honor, the United States is

6   seeking a Guideline sentence in this case.  I think it's

7   appropriate, given not only the Guidelines calculations, but

8   the Section 3553 factors.

9           I just want to give a quick note, before I

10  forget, Mr. Benvie believes this is a political prosecution,

11  and he's attached an exhibit which is three Democratic

12  members of Congress writing to the FBI regarding their

13  concerns at the border.  I can tell the Court this is not a

14  political prosecution.  Certainly, the jury found all

15  elements of the offense.  And Mr. Benvie will probably be

16  disappointed to know that it was a Republican-appointed U.S.

17  Attorney who authorized charges in this case.  So I think

18  the problem is what they're doing out there was illegal.

19  And a lot of people noticed what was going on out there.  So

20  I won't say anything more than that, but it certainly was

21  not a political prosecution.  We met all elements of the

22  offense.  The jury agreed and found him guilty.

23          Now, certainly, the defendant, in his own mind,

24  thought what he was doing was right.  And the Court now

25  knows from his history that whenever Mr. Benvie believes

1    he's right about something or has some sort of a task he

2    thinks is justified, his hero complex kicks in and he starts

3    doing things which ultimately go too far.

4            And the Court knows that from the trial

5    testimony.  Mr. Benvie was caught with a stolen moving truck

6    and -- which was only supposed to be out for one day.  And

7    his justification was he was going to provide hurricane

8    relief for people in need.  When asked about the length of

9    having taken this, he said, Well, no one ever asked for it

10   back and no one reported it.  It was the computer who

11   reported it.  When you rent something for day and you don't

12   return it, that's a pretty clear indication that you think

13   you're doing things the right way when, clearly, you're way

14   off track.  And that's just one example.

15           So in addition to the Guidelines, looking at the

16   3553 factors, Your Honor, Mr. Benvie's history goes back

17   25 years, starting in paragraph 46, with a disorderly

18   conduct.  And I will say this is a case where, sometimes

19   when you first meet a defendant, you're kind of wondering

20   how they got here, but when you look at his history, you

21   completely understand how he got to where he is today.

22   Going back to paragraph 47, he's got a theft by check.

23   Paragraph 48 is another theft.  Paragraph 49 I won't say too

24   much about because there aren't many details, but there is a

25   trespass identified there.  There is a public intoxication

1    charge in paragraph 50.

2            And then, looking at beginning with paragraph 54,

3    there are a series of civil judgments against Mr. Benvie

4    where, once again, another court has found that he was in

5    the wrong on these particular occasions.  There is a

6    judgment against him for $4,600 from a finance company.  He

7    was evicted for nonpayment of rent.  And then there are

8    other judgments.  At the top of page 12, *Twin Cities Gold*

9    *and Silver Exchange versus Guardian Gold* and others, a

10   judgment for $67,000.  *Yellow Book Sales Distribution*

11   *Company, Incorporated, versus Legacy Rare Coin and Bullion*

12   *and James Benvie*, $25,000 judgment.  And another judgment

13   for $1,800.

14           And then the Court also knows from the trial

15   testimony that Mr. Benvie went so far as to steal checks

16   from his grandparents and write hot checks on their account

17   without permission.  And that was another occasion where,

18   once again, he thought he was justified and he thought that

19   the ends justified the means.  And that is just the long

20   track record that he has established which should weigh

21   against him today for purposes of sentencing.

22           As the Court knows, in paragraphs 55 and 56, he's

23   got two warrants issued for theft and possession of a stolen

24   vehicle, which is the vehicle I already mentioned.  And when

25   he was caught on that occasion, he was, once again,

1    panhandling for a young -- young boy who had been treated

2    with cancer at a time when he was no longer even being

3    treated for cancer.  But Mr. Benvie saw it as another way of

4    collecting money and tricking people into providing money

5    because, once again, he thought he was justified.

6            So I think, given his history -- the nature and

7    characteristics of the offense and his own personal history,

8    I think certainly that in this case a Guideline sentence is

9    warranted.

10           I will say the Court saw another example at the

11   revocation hearing where Mr. Benvie, according to his

12   co-worker, not wanting to go back to the halfway house,

13   would often stay longer at work, causing the halfway house

14   to pick him up after midnight, using their resources to get

15   him after midnight because he didn't want to go back to the

16   halfway house.  So he used work as an excuse and hung out at

17   his place of business until way after hours.  And that was

18   just another example of him trying to manipulate things when

19   he thinks it serves his interests.  And of course, he told

20   the Court that he was working when he was, in fact, out and

21   about filming for purposes of the internet and -- once

22   again, just another example.

23           So I think, given these things, Your Honor, I

24   think -- and I will ask the Court to impose the Guideline

25   sentence.  I think it is more than appropriate in this case.

1          THE COURT:  Thank you.

2          Mr. Benvie, this is your opportunity now to

3   speak.  And I'll hear you on anything that's relevant to

4   sentencing.

5          THE DEFENDANT:  Okay.  Well, I'd like to start

6   with the very first part of the sentence investigation where

7   we had the revocation hearing.  And it's just interesting to

8   me how the prosecutor over here didn't take the time to

9   speak with the owner of the company, who was my supervisor.

10  I was the general manager.  I tried to explain that, but

11  they knew that because Daryl had that on record.  Everybody

12  knew the owner was off site.  So to bring in a witness who

13  made those claims, a disgruntled employee, at the very

14  best -- okay? -- who said I was drinking -- I took a U.A.  I

15  wasn't drinking, okay? -- and then made this big story about

16  how I left, irresponsibly, the building.  I closed the doors

17  for two hours.  I was at the building and I was picked up at

18  the regular time.  I was not vanished, gone, or missing for

19  eight hours.  And so I find that as -- again, when you look

20  at a political prosecution, that they keep saying this

21  isn't, you look at how they manufacture things to make it

22  look like you did things you didn't do.

23          Now, you have a letter in your hand, he's willing

24  to testify, as well, from the owner of the restaurant, who I

25  think hopefully sets that clear as to what happened and

1  whether or not I had permission.  He also called KOB4 and

2  tried to stop them from airing Ms. Sander's article.  So

3  that's -- I'll start with that.

4        So the whole La Posada thing?  I was there for a

5  year, I followed their rules, I did what I was supposed to

6  do there.  And I don't know what happened, but there was a

7  curve ball.  I think it was a setup, to be honest.  And the

8  evidence suggests that it's a setup.

9        Okay?  Moving on, I wasn't fired.  This says I

10  was fired.  I was not fired.  Okay?  The owner had to close

11  the restaurant after they detained me -- okay? -- and found

12  out that I wasn't coming back to work anytime soon.  Much

13  different story than what you heard testified and presented

14  by Mr. Castellano.  Okay?

15        Now, we get to the border, okay?  I was wearing

16  nothing that indicated I was a Border Patrol agent, that I

17  had power I didn't have.  I did nothing to hurt anybody.

18  Matter of fact, I saved a life.  And you don't have to

19  believe me, you can watch the video.

20        Mr. Castellano, one of your facts are wrong.  And

21  I'm going to tell you what it is:  The Department of

22  Homeland Security has numbers for border crossings that took

23  place in 2019 at the time I was on the border.  There was a

24  hell of a lot more than 24,000 people that went through the

25  border.  You also have to understand that while you say and

1   told the jury that I did not interact with 12,967 people,

2   again, that wasn't lie.  And you don't have to take my word

3   for it, it's on video, Mr. Castellano.  Videos that you

4   didn't show that weren't allowed into the court during the

5   trial, which would have had a different outcome had people

6   known the truth.  But the truth was stopped from coming into

7   the trial.

8           Another issue, okay?  You've got "detention" and

9   "ordered" all over this thing.  There is a difference

10  between ordering and asking people.  Nobody was ordered in

11  either one of those videos to do anything.  If I say "stop,"

12  that's freedom of speech.  That's not -- you know, nobody

13  held a gun and pointed it at somebody and said "Stop, Border

14  Patrol."  Okay?  You fabricated this case.  I'm going to

15  fight it.  I'll go to prison.  But I'm going to tell you

16  something, Mr. Castellano, your Democrats -- okay? -- you

17  organized this with Veronica Escobar.  You organized it with

18  Michelle Lujan Grisham.  The reason you did it, your motive,

19  is because -- what were they hiding?  What were they hiding,

20  Mr. Castellano?  What were they hiding?  How about oath of

21  office?  How about treason, okay?  Oh, how did they commit

22  treason?  That's a serious accusation, Mr. Benvie.  What did

23  they do?  What did they do?  Did they not lie about what

24  happened at the border?  Did they not pull the National

25  Guard off the border?  Why did they pull them off the

1    border, Mr. Castellano?  Why did they do that?  And what did

2    they do when they did that?  Oh, that's right, we had a

3    strained Border Patrol.

4            So what happened then?  Oh, we had open -- Border

5    Patrol's first job is what?  Deterring weapons of mass

6    destruction.  What's their second job?  Preventing terrorism

7    and enemies coming into the country.  But instead, these

8    Democrats lied to America and said that Donald Trump

9    manufactured the crisis when, in fact, he didn't; when, in

10   fact, my videos -- not the two videos you chose, you --

11   yeah, you went like the Bible and picked a verse and built a

12   religion, okay? -- it shows what was going on out there,

13   okay?  And for you to say I wasn't working with Border

14   Patrol agents, you're out of your mind.  I have hours of

15   videos of Border Patrol agents -- and this is for you, Your

16   Honor -- that are actually thanking me for what I was doing.

17   Actually, the Santa Teresa guy you brought in, you brought

18   in the wrong guy.  The guy you should have brought in was

19   the guy from El Paso, the guy who got removed as chief, who

20   got sent to Michigan.  Oh, the jury didn't hear that,

21   either.  But they might have had a different opinion, if

22   they did.

23           Let me tell you something else the jury didn't

24   hear, okay?  Another thing the jury didn't hear from any of

25   this was the proper instructions of what they were supposed

1    to base the crime on:  USC 912, 18 [sic].  You told them

2    that simply by me saying "Border Patrol" -- I didn't say, "I

3    am Border Patrol," never said that -- by my saying "Border

4    Patrol" while pointing behind me -- how many Border Patrol

5    agents approach immigrants undercover, as you implied that

6    I'm undercover, with a cell phone camera, which, by policy,

7    Border Patrol is not allowed to carry a cell phone camera or

8    video or record anything.  But you said I was impersonating

9    a Border Patrol agent because I said, "*Alto*," I said,

10   "Border Patrol," as I was pointing like this behind me to

11   the agent who was sitting up the road, which I had passed in

12   my car, okay?  And it's funny how he got there within, what,

13   three minutes?

14           Now, if Border Patrol hadn't been there just

15   because you say, The reason I'm here is because Mr. Benvie

16   said Border Patrol ain't there.  The reason I said that is

17   because I was talking to my camera, the thousands of people

18   who were watching this live, who disagree with you and your

19   prosecution and your crazy Democrats, who think that this is

20   a joke, who think that this is some kind of a -- a game to

21   prosecute a private citizen maliciously -- okay? -- and then

22   try to make a double felon out of them.

23           And then you bring a cancer story, a cancer story

24   that hasn't even been proven.  And there's so many

25   conflicting versions.  The mom doesn't -- the boy doesn't

```
 1    exist, is what we start with.  Then the Dad shows up here
 2    and he's all upset, but he won't admit that I helped his
 3    mother.  That's the whole story you're all missing here.
 4    His mother.  I paid for the attorney.  Mr. Cremeens knows
 5    damn well who I am.  Okay?  I spent thousands of dollars on
 6    legal fees, not because she's my girlfriend, as the story
 7    changed and evolved, but because of the fact that I helped
 8    her and thought that it would be a good thing to do to help
 9    her get her son back.  Okay?  So far what you've done is
10    you've perjured yourself.  This right here and everything
11    I'm saying right now -- and I know Orlando hasn't had time
12    to watch all of the videos because, for some reason, he's in
13    El Paso, Texas, and where am I?  Stuck in Bernalillo County
14    for a year and a half.  Doing what?  You got to get a job,
15    Mr. Benvie.  But you know what?  You got a busy attorney
16    over there.  He didn't have time to go through all this
17    crap.
18            So in a nutshell, everything you write looks
19    great on paper, if you take the sizzle to the words and some
20    of my context statements that are taken out of context
21    versus the written transcript of the trial, okay?  So I
22    never said I was associated with Border Patrol.  Let me
23    repeat that.  I never said I was associated with Border
24    Patrol.  You're using that to give me an enhancement.  What
25    I did say is that Border Patrol gave us rules of engagement.
```

1    I don't take that statement back.  That's a fact.

2              And you don't have to believe me again.  Because

3    you know what, again, I'm going to point you to another

4    resource that the jury should have seen that you didn't

5    bring into the picture.  And let me tell you what that is,

6    Your Honor.  When Border Patrol gave me the rules of

7    engagement, they told me, for my protection and for the

8    protection of the group, that they were going to do reports

9    on the individuals that we turned over.  To.  Them.  Did you

10   get those reports, Mr. Castellano?  How do you say I'm not

11   associated with Border Patrol when we're writing reports

12   about what they have to say?  Did anybody complain?  I don't

13   think so.  How many reports are there, Mr. Castellano?  The

14   jury should have seen that.  Because wouldn't that have

15   removed any doubt at all?  If you were seeking the truth

16   about this case, Mr. Castellano, which you're not, but you

17   say you are, wouldn't that have been important for the jury

18   to hear, if you weren't politically motivated, if this

19   wasn't a corruption case, if this wasn't a let's picture and

20   paste everything together?

21             Let me give you another example of corruption in

22   this case:  The warrants that were July 15th out of

23   Oklahoma.  This gets better, okay?  You keep referring to

24   this stolen vehicle warrant in Tennessee, $10,000, as if

25   that's already been charged and followed.  You give an

1   example about the Penske truck in Oklahoma, okay?  Where was
2   I at when I was arrested, Mr. Castellano?  Where was I?  I
3   was at court, in Oklahoma, with my attorney, in the middle
4   of resolving that case.  You act as if you know the
5   resolution, that I'm guilty of stealing a rental truck.  A
6   lot you don't know.

7            And I'm going to tell you something else.
8   Mr. Cremeens.  We're about to file a police report on your
9   good buddy, Mr. Cremeens, for filing a false police report
10  when his wife, his ex, has every right and did at the time
11  to take money for the little boy.  The little boy is still
12  not out of the clear.  He's got another year.  This is about
13  a family trial.  This is about a family case.  This is about
14  a guy who alienates -- alienates -- you ever heard of
15  "parental alienation"?  That's Mr. Cremeens.  Plays the
16  bigshot, has the Facebook page, pretends he's father of the
17  year, puts the boy out there.  But guess what's done?  He's
18  destroyed an entire family.  She lost her house, had to pawn
19  it to pay for attorney's fees.  You know why?  Because while
20  he was here in court -- let me tell you what Mr. Cremeens
21  did the last time he was here.  He was here with his family
22  attorney, Laura -- what's her last name?  I can't remember
23  now.  Laura, whatever, she's seen me plenty of times because
24  I brought ex-wife to court.  Guess what she was here doing?
25  They were having a romantic getaway.  He was cheating on his

1    wife.  That's what they were doing here.  They were screwing

2    each other.  How do you like that, Mr. Castellano?  You want

3    to know the truth?  Ask Orlando, he saw it.  I saw it.  And

4    you know what?  It's been an accusation that's been out

5    there for a long time.  The only reason Mr. Cremeens flies

6    from Kentucky to here is because he's trying to damage my

7    credibility, which you guys did a good job of doing when you

8    started this case -- my credibility, okay? -- so that I am a

9    worthless witness in family court.  Because I'm one of the

10   key witnesses to Ryan, the little boy with brain cancer --

11   who I was there when he had his surgery -- getting his mom

12   back, who he wants to be with.  And if you don't believe

13   that, you don't have to believe me.  There's a ton of the

14   videos of the little boy crying and, even at the hospital,

15   asking for his mother, while Mr. Cremeens grabbed him by the

16   arm violently, dragged him into the closet and closed the

17   door shut.  This was going on way before I came into the

18   scene.  This is something that started back in 2011.

19        So I love the dramatics.  Obviously, you knew you

20   weren't sure if you could win the Border Patrol case, so you

21   decided to bring in Mr. Cremeens and his dog and pony show

22   so that you could, Oh, Mr. Benvie did this to a boy with

23   cancer.  No, he didn't.  No, he didn't.  It's all

24   allegations.  It's all bull.  And all of this, this is all

25   toilet paper right here.  Now, you may have a judge who goes

1   along with you, Mr. Castellano, doesn't care about the

2   facts, but there is a judge out there.

3          This was all done by Democrats.  There was not

4   one Republican.  You say a Republican prosecutor.  Again,

5   I'm going to call you a liar.  You know why?  Because you

6   wouldn't answer the question, when my attorney, Mr. Orlando,

7   asked you what, specifically -- who, specifically, made you

8   go through hundreds of hours of tapes looking for potential

9   crimes.  You know what he told me?  Well, it was an

10  anonymous -- we don't know who -- the FBI doesn't know who,

11  but they just started going through tapes randomly because

12  nobody with power asked them to, right?  I'm a conspiracy

13  theorist, right, Mr. Castellano?  Isn't that -- isn't that

14  what I am?  Okay?

15         So yeah.  Then we go back here.  We look at

16  the -- we look at all of this, all this crap.  You bring in

17  the wrong Border Patrol people.  The two people you brought

18  in, we had very little contact with.  That's a fact.  Even

19  members of the media, who are liberal -- okay? -- did

20  documentaries down on the border where we were working with

21  Border Patrol -- I'm going to say it again -- working.

22  With.  Border Patrol.  Lots of vehicles out there.

23  Helicopters flying.  People running all over the place.  We

24  preventing them from getting hurt.  How about this,

25  Mr. Castellano?  Did you tell anybody in the courtroom that

1    a woman would have been dead, had it not been for our

2    organization?  Did anybody talk about that?  That a life was

3    saved?  That the community on the border was safer because

4    we were there?  No.  No, because that doesn't fit the

5    political agenda here.

6            So you guys do what you're going to do to me.

7    Know this:  I will be back in court.  I'm going to file.  I

8    have a right to.  I may have to get a different attorney, I

9    don't know.  But I'm going to fight this.  You know why?

10   Everybody said, "Don't fight it, Jim.  Just play nice with

11   them.  Sign the deal.  Six months, you could have walked

12   away.  Sign the deal.  Be nice, Jim."  You know what?  Some

13   people have to fight.  You know why they have to fight?

14   Because if nobody fights for the truth and you don't stand

15   for something, you lose everything.

16           And I'm ready to sit behind bars, Mr. Castellano,

17   if that's what it takes, but I'm going to get Veronica

18   Escobar, Michelle Grisham, and I'm going to get Deb Halen

19   all under oath in some courtroom, somewhere in this country.

20   And even if you let me go today, I don't care.  I'm not done

21   with this.  This is about principle.  And you can go back

22   26 years.  That's what Democrats do.  They go back 26 years.

23   Back in 1900s, Mr. Benvie took a popsicle stick that didn't

24   belong to him.

25           You're a sick man, Mr. Castellano.  You took an

1    oath of office, too.  To find of the truth.  Your truth that

2    you're telling this judge right now, it shows that you did a

3    lack of homework, a lack of research.  You haven't done your

4    homework, okay?  And you're an embarrassment to the office.

5    So do what you're going to do.  I don't care.  I've laid out

6    the facts here.  This is bullshit.  And you don't have to

7    take my word for it.  You can look at the law.  You can look

8    at the videos.  It'll require more videos and more time.

9    But you don't want those other videos in the courtroom.  I

10   had no witnesses, Mr. Castellano.  Not one witness.  You

11   brought five people in here.  Five people who weren't even

12   on the border.  Five people who knew nothing other than the

13   videotapes.  The judge is just as much of a witness as you

14   are.  Or he is.  Or anybody else.  And I didn't see anybody

15   get hurt in that video.  Matter of fact, I went back to the

16   comments about from the 400,000 people that were watching

17   the videos, because I wanted to see did anybody on those

18   videos comment and say, Holy shit, he's impersonating a

19   Border Patrol agent.  Guess what?  Nobody said that.  Except

20   for the FBI agents in Albuquerque, which is -- I don't

21   believe that's a coincidence, either -- from the

22   counterterrorism department, okay?  Everybody who believes

23   in the Second Amendment knows they're terrorists, aren't

24   they?  Yeah, that's coming front and center, too.  Second

25   Amendment rights?  They're inalienable, okay?

1          So you know, you know where we're at with this
2    country:  Socialism versus a free republic.  And guess what?
3    Nobody voted for open borders, Mr. Castellano.  Nobody said,
4    at this point, it was okay to leave the borders wide open
5    susceptible to terrorists and other people.  And you want to
6    know something?  If Border Patrol wanted us out of there, or
7    even the Department of Homeland Security, for that matter,
8    not the Albuquerque FBI, we wouldn't have been there for
9    five months, camped.  Who camps next to the border, if they
10   don't have permission from the Border Patrol?  Who does
11   that?  Can you go grab your trailer and go park by the wall?
12   See how long you last there, Mr. Castellano.  Go try it
13   right now.  That should settle the case, shouldn't it?  Get
14   your RV, get your buddies, go down there with guns and
15   camouflage, say, "Hey, man, we're here to protect the
16   border."  You ain't got permission, you ain't going to be
17   there, Pal.

18          The reason I had to drive, the reason I had to
19   wear my jacket?  Those pictures that you have where, in the
20   first couple days, I had the jacket, is because Border
21   Patrol would not allow anybody past the gate, the end of the
22   wall, unless they had specific identification.  Now, it
23   wasn't given us to, you're right.  Nobody gave people
24   camouflage, nobody issued them, but they did give us rules
25   of engagement.

1          And matter of fact, Chad Walsh, the acting Border

2     Patrol director for the United States of America -- let's

3     throw him into this now -- at that time I was there, he did

4     a press conference asking for nongovernmental organizations

5     to help at the border.  Call me a liar.  I'll show you the

6     news video.  That was the El Paso Sector.  The El Paso

7     Sector had over 100,000 people cross, Mr. Castellano, not

8     24,000.  We had more than that in the month of April and

9     May.  You're trying to make it sound like, Oh -- I don't

10     know where Mr. Slosar is getting his numbers.  I'm not

11     really that familiar with Mr. Slosar, being that he was way

12     down the road from where we operated, okay?  But you can go

13     to the DHS.  You don't have to take my word for it, unless

14     you don't believe that the DHS is giving credible numbers.

15     Some people don't.  But you used that to tell the jury I was

16     a liar.  You -- you misled them with your fake numbers.

17          Then you continued to mislead the jury by telling

18     them that Mr. Benvie was -- thought it was a joke to cross

19     into Mexico and take pictures of license plates, but he

20     really wasn't giving them the Border Patrol, he was just

21     doing it for fun.  Are you serious?  Do you still hold to

22     that?  Because I'm ready to have Border Patrol agents come

23     into the next trial.  I didn't think I needed them, to be

24     honest with you, Mr. Castellano, because I didn't want to

25     put their families in harm's way.  There is no honor for

1    them.  I'm not stealing anybody's valor.  Okay?  They were

2    being degraded because they were being accused of putting

3    kids in cages.  Okay?  They were being degraded by the fact

4    that people were mocking them and calling them "racist" just

5    because of the job that they do.  And they do it well, by

6    the way.  Okay?  These are people whose families went out

7    and bought things out of their own pockets.  Their own

8    water, their own food, to feed who?  To feed the immigrants

9    when they came across without shirts on, making sure that

10   they were safe, making sure that they didn't run out into

11   Paisano, like it happened when we were out there, and get

12   hit by a car and get killed.  Agents whose wives said, Thank

13   you, Mr. Benvie.  Thank you for being out there.  You know,

14   my husband's out there at 2:00 in the morning.  And there

15   are 1,700 people and cartel members escorting people to the

16   end of the wall, running across the border, and I'm over

17   there by myself.  And you know what?  It's nice that there's

18   a few extra people out here that give a shit.

19            Don't tell me I stole valor.  Those videos are

20   nothing but giving valor and praise to the Border Patrol and

21   the men who were out there, working.  I never said, "I am

22   Border Patrol."  If anybody stucks [sic] or believes in law

23   and order, it's me, sitting right here.  And if I felt that

24   I did it, I'd admit to it.  I'd tell you, "I committed [sic]

25   an agent."  I'm going to go in prison just because I didn't

1   do it.  I don't care.  If it helps take down some people

2   that I think have done some real damage to this country,

3   I'll sit in prison all day.  Because something's got to

4   stop.  Something's got to stop, and it starts with the

5   lying.

6          Escobar is sending her attorneys across the

7   border -- she was a judge or her husband's a judge --

8   sending attorneys across the border to show people how to

9   get access to fake birth certificates; how to lie to

10  Immigration officials about credible fear.  And you think

11  it's a joke.  You don't go -- you don't talk about the

12  people that were out there vulnerable.  It's kind of like

13  what Hillary Clinton did in Benghazi.  She left everybody

14  hanging; said, Screw you.

15         So you made a case.  You've created a perception

16  for this jury and this judge, obviously, that these things

17  happened that didn't happen.  But it's perception, it's not

18  reality.  Some people say, "Perception is reality."  You've

19  created a perception.  And along with your weak statute and

20  the way you changed it at the end there, you know what

21  you've done now?  You've created new case law.  Your new

22  case law now says that anybody walking near the border who

23  asks, Where are you from," is now a Border Patrol agent.

24  They've now impersonated a Border Patrol agent.

25         You said I was the poster child.  Those were your

1    words.  He's the poster child for this.  The jury

2    deliberated for an hour and a half because they didn't know

3    what the hell the crime was.  They needed further

4    instruction.  I almost thought I did it, based on what you

5    said.  Because I did say, "Border Patrol."  I admit to that.

6    I did say, "Alto," stop, and I did say the other things I

7    had to say.

8          So with that being said, I'm going to let you

9    guys deal with this, because you know what's here, you know

10   what's right and what's wrong.  I've shown you all the

11   problems with this case, I've shown you the corruption

12   involved in it, and I've shown you that this is political.

13   Nobody wants to admit it in here, but this didn't just start

14   on its own.  There was more than just a letter from -- to

15   Congress, there was more than just the ACLU whining and

16   crying.  The same ACLU, by the way, that was down there

17   destroying Albuquerque, okay?  I'm just saying, you know,

18   let's call a spade a "spade."  The Southern Poverty Law

19   Center?  They're in on this, too.  Did you know that?

20   Because they label people "hate organizations," and then

21   they raise -- they do the panhandling, they raise the money

22   off of that.

23         So you know, you got -- you got what you got

24   here.  You've already had me incarcerated for almost

25   16 months.  Just for a, what, three months in jail?  The

1    judge down there in Oklahoma said that Mr. Benvie shouldn't

2    even be in jail.  He said, Mr. Benvie should have been

3    released with an ankle bracelet and kept 10 miles from the

4    border after he had a job.  Guess what?  You didn't give a

5    shit about the judge in Oklahoma and what he had to say

6    because you know what you did?  You kept me in the halfway

7    house.  I was there longer than people who were on trial for

8    killing people.  People that got out of the prison as sex

9    offenders.  I was there for, what, a year, over a year?  And

10   then finally, right before sentencing, we get the work scam.

11   You knew who my boss was.  Nobody called him in here.  And I

12   sure as hell couldn't call anybody because I'm stuck here.

13   I'm relying on other people to call and make calls for me.

14          I've got nothing else to say.  I didn't do it.

15   I'm not taking responsibility...to get three points, so you

16   can bribe me for three points; a little less time in jail.

17   I'm not going to do that, either.  That's actually wrong

18   because, when somebody goes to trial, they're exercising

19   their right and taking responsibility.  Taking

20   responsibility isn't whether I agree with you finding me

21   guilty or not.  You're asking me to give up my rights to

22   appeal in order to get that three-point deduction.  That's

23   pretty sick, if you ask me.  I'm not that guy.

24          So with that being said, I'm done.  I've got

25   nothing more to say.

1          MR. CASTELLANO:  Your Honor, if may have a couple

2     of points of clarification, based on Mr. Benvie's remarks?

3          THE COURT:  Yes, sir.

4          MR. CASTELLANO:  Excuse me.  My lights just went

5     out in my office.

6          For one, in terms of numbers, Agent Slosar didn't

7     say it was 24,000 people on the entire border.  It was

8     24,000 people from the Santa Teresa station.

9          THE DEFENDANT:  It was the El Paso and Santa

10    Teresa that counted for me.

11         MR. CASTELLANO:  The transcript --

12         THE DEFENDANT:  You have the wrong location here,

13    Mr. Castellano.

14         MR. CASTELLANO:  -- at the Santa Teresa station.

15         Now, Mr. Benvie says we're trying to put words in

16    his mouth.  In page 58 of the transcript, in his own words,

17    he says (reading), "I don't agree with that, but I will tell

18    you this:  They would stop if they knew the word and they

19    thought that I could either get them to Border Patrol or I

20    was associated with Border Patrol.  And the fact is I was

21    associated with Border Patrol."  In his own words.

22         And then, when Ms. Camacho asked, down the page,

23    once again, on page 58, "So you said you were associated

24    with Border Patrol, in your mind, because you had spoken to

25    Border Patrol agents?"

1         His response?  "Because I was there for

2    five months, and I turned over 12,970 people.  Is a little

3    bit -- that's a little bit more than association.  24 hours

4    a day.  We were out there longer than most Border Patrol

5    agents [who] worked on a shift."

6         So in his own words, as I've stated from the

7    transcript, Mr. Benvie admitted he was associated with the

8    Border Patrol.

9         THE DEFENDANT:  (Speaking.)

10        THE COURT:  Mr. Benvie, Mr. Benvie, you are muted

11   at this point because you were interrupting Mr. Castellano.

12   I'll allow you to speak when he's through.

13        MR. CASTELLANO:  Thank you, Your Honor, I have

14   nothing further.

15        THE COURT:  Thank you.

16        Mr. Mondragon, anything else?

17        MR. MONDRAGON:  No, Your Honor.  I think my

18   client, he covered everything he needed to cover on the

19   issues he has with this case.

20        THE COURT:  And Mr. Benvie, I'll unmute you so

21   you can have a moment to make any comments you might have

22   had about Mr. Castellano.

23        THE DEFENDANT:  Just that, when I -- when she was

24   asking me that series of questions in a quick hurry, my

25   intention with that statement was simply this:  Is that I

said "Border Patrol" because we didn't know what country

they were from also.  And sometimes, when they heard "Border

Patrol," they recognized that word.  Sometimes they didn't.

In this case, I don't even think they recognized the word

"Border Patrol," to be honest with you.  But in any case, I

would say it, so if they thought -- if they thought that I

was associated with Border Patrol or knew how to get them

there that they would stop and that -- because they were

looking for Border Patrol, Mr. Castellano.  Most of these

people who came across weren't running from Border Patrol.

We were there to show them how to get there.

Border Patrol did ask us if we would have them to

sit down, but we never forced anybody to sit down.  We

never -- as the word says "detention" or "detained," we

never forcibly detained anybody.  So if it's worth six years

in prison for asking somebody to sit down, that's what

you're -- that's what you're asking the judge to do right

now, Mr. Castellano.

I got -- that's it.  That's all I got to say.

THE COURT:  Thank you, Mr. Benvie.  And I have

heard you at length this afternoon, Mr. Benvie.  I heard you

at length at trial and at pretrial hearings.  And I believe

that the jury came to the right conclusion.  I believe that

you did represent yourself as Border Patrol on multiple

occasions.  You testified, yourself, that you were

1   associated with Border Patrol, that you had been given

2   permission by numerous members of the Border Patrol that you

3   declined to name, had given you that permission.

4           And so the prosecution, in your mind, is

5   politically motivated.  I don't believe that.  I certainly

6   can't speak to it.  I don't know of any evidence that would

7   support your accusation.  But whatever the motivation, you

8   were appropriately found guilty of representing authority

9   you did not have.  And in that process, I believe that

10  you -- you perjured yourself.  And looking at the history

11  and knowing of the -- of your other civil and criminal

12  history, I don't believe that you know the truth.  I think

13  you've convinced yourself of a lot of things, but I'm not

14  sure that the truth is in you.

15          I will --

16          THE DEFENDANT:  You don't have to take my word,

17  Mr. -- Your Honor.  Your Honor, if you want to take the time

18  and watch the videos, everything that you're saying that I

19  didn't say or didn't do is on video.  That's why I videoed

20  everything.  That's why I told the lady, I said, Everything

21  is on video.  There's proof of everything I'm telling you,

22  so you don't have to trust me, you don't have to believe me,

23  it's all videoed, but you have to take the time to watch it.

24  And I've told you there's hundreds of hours of video.  But I

25  can't do it when I'm tied up and I don't have the attorney

1   to spend hundreds of hours with me while I'm stuck in

2   Albuquerque.

3        THE COURT:  Mr. Benvie, I understand that's your

4   position.  And that should be the last time that you

5   interrupt me while I'm speaking.  I didn't interrupt you

6   while you were speaking.  And in fact, we'll mute his mic,

7   please, in the meantime.

8        I...in what I believe is a misguided sense of

9   purpose and heroics, you and the members of the

10  Constitutional Patriots may have believed you were well

11  motivated, that you should be there and you were serving a

12  legitimate purpose, but I can't speak for the rest of the

13  folks involved, but I can speak to you as it relates to

14  these charges.  And you crossed the line and that, I -- I

15  mean that metaphorically, but in fact, you also crossed the

16  line into Mexico.

17       I -- part of the judge's purpose in imposing any

18  sentence is rehabilitation.  I have heard you, as I said, at

19  length on multiple occasions and, frankly, I don't think

20  that any sentence I'm going to impose is going to change

21  your mind or mis- -- or otherwise direct your thoughts.  And

22  I think you will come out of jail as angry and as bound up

23  by your conspiracy theories as you were when you went in.

24  And so the reason for the sentence and the only thing I can

25  hope to achieve is -- is you will not be committing these

1    sorts of crimes, you will not be putting yourself and others

2    at risk, as I believe you did out there on the border, in

3    the meantime.

4            And with all that in mind, I've -- I'll adopt the

5    Presentence Report factual findings.  I've considered the

6    Sentencing Guideline applications and the 3553 factors.

7            The Offense Level is 16.  The Criminal History

8    Category is I.  The Guideline imprisonment range is 21 to

9    27 months.

10           I note that the Mr. Benvie, on at least two

11   occasions, portrayed himself as a member of the United

12   States Border Patrol to migrants entering the United States

13   from Mexico for the purpose of conducting unlawful arrests,

14   detentions, or searches.  Furthermore, he obstructed the

15   administration of justice by providing material false

16   testimony at trial; namely, that he and members of his group

17   were given permission by the United States Border Patrol to

18   detain and question migrants crossing the international

19   border.

20           As to Counts 1 and 2 of the Indictment, the

21   defendant, James Christopher Benvie, is committed to the

22   custody of the Bureau of Prisons for a term of 21 months.

23   Those terms will run concurrently.

24           As to Counts 1 and 2, I'm going to place

25   Mr. Benvie on supervised release for a term of one year as

1    to each count.  They will run concurrently.  And Mr. Benvie

2    has to comply with the mandatory and standard conditions of

3    supervision.  I will suspend the mandatory drug testing

4    condition, as the defendant poses a low risk of substance

5    abuse.  The following special conditions will be imposed,

6    though:

7            I want you to complete 50 hours of community

8    service during your supervised release.  The Probation

9    Office will supervise your participation in the program by

10   approving the program and signing off on the written

11   verification of hours.

12           You have to submit to a search of your person,

13   property, automobile, computers.  All of your stuff and your

14   person are subject to a search, if the Probation Office has

15   reasonable suspicion to believe that you have failed to

16   abide by your conditions of release.  And anyone that lives

17   with you needs to know that the residence and occupants of

18   that home are subject to a search.

19           You're not to incur new credit charges, negotiate

20   or consummate any financial contracts, or open additional

21   lines of credit without prior approval of the Probation

22   Office.  And you have to provide the Probation Office access

23   to requested financial information and authorize the release

24   of financial information.

25           You have to reside at a residential reentry

1    center for a term of up to three months.  You have to follow

2    all the rules and regulations of that center.

3         Based on your lack of resources, I'm not going to

4    impose a fine.  However, I believe that I've imposed as a

5    special condition that you complete community service and

6    reside at a residential reentry center; therefore, I'll

7    conclude that the total combined sanction, without a fine,

8    is sufficiently punitive.

9         The special assessment of $100 as to each count

10   of conviction for a total of $200 must be paid during the

11   term of your incarceration or subsequent supervision.

12        And you have the right to appeal the sentence

13   I've just imposed.  That would have to be done within

14   14 days.  Counsel could assist you and it wouldn't cost you

15   anything.

16        Mr. Mondragon, is there a request for

17   designation?

18        MR. MONDRAGON:  Your Honor, I believe he wanted

19   to be, when I spoke to him last time, I think, near

20   Pennsylvania, if I'm correct?

21        THE COURT:  Is Mr. Benvie unmuted?

22        Mr. Benvie, can you hear me now?

23        THE DEFENDANT:  Yeah.

24        THE COURT:  The question was about designation.

25   And Mr. Mondragon indicated that you had suggested a

1    preference for Pennsylvania; is that true?

2              THE DEFENDANT:  Are you talking about to go to

3    prison?

4              THE COURT:  Yes --

5              THE DEFENDANT:  Okay.

6              THE COURT:  -- where you'll be held.

7              THE DEFENDANT:  Okay.  So yeah, Pennsylvania.

8              THE COURT:  I'll be glad to recommend that the

9    Bureau of Prisons house you in Pennsylvania.  Do you have

10   family there?  Is that the reason for the request?  I --

11             THE DEFENDANT:  I have somebody there that's kind

12   of like a sister, but like I said, I've got to have...

13             THE COURT:  That will help in the recommendation

14   to the Bureau of Prisons, they like to designate folks to

15   facilities that are close to family, so you can have ongoing

16   contact with them.

17             Is there anything else this afternoon?

18             THE DEFENDANT:  So I just want to -- so I

19   understand this:  So I'm going to go to prison for two years

20   and then a year of probation?  Is that what you're saying or

21   halfway house again?

22             THE COURT:  So 21 months was the sentence.  You

23   have credit against that 21 months for all of the time that

24   you've served.  And yes, I'm imposing a period of one-year

25   supervision following your release.  And the time at the

1    residential reentry center is up to three months.  If you

2    have a home that is approved by the Probation Office, then

3    you won't have to go to a residential reentry center.  It's

4    an option for your release.

5                 THE DEFENDANT:  Okay.

6                 THE COURT:  Anything finally, Mr. Castellano?

7                 MR. CASTELLANO:  No, Your Honor.

8                 THE COURT:  Mr. Mondragon?

9                 MR. MONDRAGON:  Nothing further, Your Honor.

10                THE COURT:  Mr. Benvie?

11                THE DEFENDANT:  No.

12                THE COURT:  Anything else?

13                THE DEFENDANT:  (Indicating.)

14                THE COURT:  Thank you.  We're adjourned.

15                COURT CLERK:  Thank you, everyone.  That

16   concludes this afternoon's hearings.

17                (The proceedings concluded at 2:38 P.M.)

18

19

20

21

22

23

24

25

1                    UNITED STATES OF AMERICA

2                    DISTRICT OF NEW MEXICO

3

4               CERTIFICATE OF OFFICIAL REPORTER

5        I, Vanessa I. Alyce, CRR, RPR, NM CCR, and Federal

6    Official Court Reporter in and for the United States

7    District Court for the District of New Mexico, do hereby

8    certify that pursuant to Section 753, Title 28, United

9    States Code, that I did report in stenographic shorthand to

10   the best of my skill and ability the foregoing pages 1-47 of

11   the proceedings set forth herein, that the foregoing is a

12   true and correct transcript of the stenographically recorded

13   proceedings held in the above-entitled matter and that the

14   transcript page format is in conformance with the

15   regulations of the Judicial Conference of the United States.

16

17   Dated this 2nd day of November 2020.

18

19   S/Electronically Filed
     Vanessa I. Alyce, CRR, RPR, NM CCR #259
20   Federal Official Court Reporter
     100 North Church Street
21   Las Cruces, NM 88001
     Phone: (575) 528-1430
22   Email:  Vanessa_Alyce@nmd.uscourts.gov

23

24

25